# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| RICHARD YOUNG, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 19-2144 (RC) |
| | : | | |
| v. | : | Re Document No.: | 62 |
| | : | | |
| SONNY PERDUE, | : | | |
| *Secretary, United States Department* | : | | |
| *of Agriculture* | : | | |
| | : | | |
| Defendant. | : | | |

## <u>MEMORANDUM OPINION</u>

### GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

Plaintiff Richard Young was discharged from his job at the United States Department of Agriculture's ("USDA") Foreign Agriculture Service ("FAS") after the agency withdrew his interim security clearance.  He then filed this action claiming employment discrimination, retaliation, and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964.  The USDA now moves for summary judgment on all three claims, asserting that there is no genuine dispute of material fact for trial.  The Court agrees and accordingly grants the agency's motion for summary judgment.

## II.  BACKGROUND

### A.  Factual Background

#### 1.  Plaintiff's Removal from USDA

The USDA hired Plaintiff—who is a heterosexual, African American man—in January 2015 as the Chief Information Officer for the FAS.  Def.'s Statement of Material Facts ("Def.'s

Statement") ¶ 1, ECF No. 62-2.  The description of the position indicates that it requires a clearance.  Ex. A to Def.'s Mot. at 80, ECF No. 62-3.  On February 10, 2016, the USDA granted Plaintiff an interim security clearance while final adjudication remained pending.  Def.'s Statement ¶¶ 4–8.

In late 2016, the USDA Office of Inspector General ("OIG") received two complaints against Plaintiff related to the agency's ethics and conduct regulations.  *Id.* ¶¶ 9–10.  In November 2016, a Personnel Misconduct Investigator began reviewing Plaintiff's email communications on USDA systems, which he found to include instructions for contractors to access and review invoices on the Invoice Processing Platform, which the U.S. Treasury provides to agencies to "process and pay invoices under business contracts the government enters into for the procurement of goods and services."  Ex. J to Def.'s Mot. at 5, ECF No. 62-12; *see also id.* at 10.  The investigator additionally discovered emails instructing contractor staff to assist Plaintiff with personal business, as well as details of unauthorized speaking events on behalf of the USDA.  *Id.* at 3, 9–10.  The investigator also found an April 2016 civil judgment against Young for approximately $232,000—among other debts.  *Id.* at 11.

On March 2, 2017, the FAS informed the USDA's Personnel and Document Security Division that it was investigating Plaintiff for misconduct allegations, including "conflicts of interest in the award of several contracts;" allowing "contractors to use [Plaintiff's] credentials to approve the payments for other contractors;" "inappropriately charging hours against contracts to support [Plaintiff's] personal activities;" and failure to report several hundred thousand dollars in civil judgments.  Ex. E to Def.'s Mot. at 2, ECF No. 62-7.  The FAS stated that it had "discovered" a judgment against Plaintiff "for the amount of $231,940.84" and that it was "not aware of [Plaintiff] reporting this matter."  *Id.*  On March 3, 2017, the FAS placed Plaintiff on

paid administrative leave following withdrawal of his interim security clearance.  Def.'s
Statement ¶ 14; Ex. G to Def.'s Mot., ECF No. 62-9.  A July 25, 2017, investigatory report
detailed evidence the FAS found to support several of the misconduct allegations.  *See* Ex. J to
Def.'s Mot.

On October 5, 2017, the FAS issued Plaintiff a notice of proposed removal, listing eight
different grounds for his termination.  Ex. I to Def.'s Mot., ECF No. 62-11.  The USDA stayed
Plaintiff's removal at the request of the U.S. Office of Special Counsel, however, while the
USDA's OIG investigated allegations Plaintiff made against another FAS official, Bryce Quick.
Def.'s Statement ¶ 39.  Plaintiff remained on paid status during this time.  *Id.* ¶ 40.  On February
15, 2019, FAS Administrator Ken Isley notified Plaintiff of his decision to "suspend [Plaintiff]
indefinitely, from duty and without pay."  Ex. K to Def.'s Mot. at 2, ECF No. 62-13.  The notice
stated that Plaintiff's security clearance was withdrawn on March 2, 2017, and that "[a]s a result
of the withdrawal of your interim security clearance, you are not eligible to perform the duties of
your position."  *Id.*

### 2. Bryce Quick's Resignation from USDA

In late 2016, Plaintiff reported FAS Chief Operating Officer Bryce Quick to the OIG for
"unethical conduct" and "concern that Quick was receiving kickbacks" from contractors.  Def.'s
Reply to Pl.'s Statement of Material Facts ¶ 8, ECF No. 69-2.  The OIG opened an investigation
in 2017.  *Id.* ¶ 38.  During this investigation, the OIG discovered that Quick had made a false
statement in a 2017 civil rights investigation when he denied financial involvement with a
contractor employee.  Def.'s Statement ¶ 50.  On February 28, 2019, the USDA's Personnel and
Document Security Division informed FAS Administrator Isley that it had suspended Quick's
security clearance.  *Id.* ¶ 56.  Quick completed an assigned detail in Rome, and the agency

detailed him to a nongovernmental organization in April 2019.  Def.'s Reply to Pl.'s Statement
of Material Facts ¶ 45.  The agency placed Quick on indefinite suspension on October 19, 2019,
due to suspension of his clearance.  *Id.* ¶ 47; Ex. S to Def.'s Mot., ECF No. 62-21.  Isley
informed Quick that there was no position for him within the USDA because he had lost his
clearance.  Def.'s Statement ¶ 61.  Quick resigned from the agency on November 27, 2019.  *Id.*
¶ 59.  In a report issued August 13, 2020, the U.S. Office of Special Counsel concluded that
Quick "did not receive financial kickbacks or other benefits from contractors in exchange for
allegedly allowing the contractors to inflate bills for services at FAS."  Ex. N. to Def.'s Mot. at 2,
ECF No. 62-16.  Quick is a white, homosexual man.  Def.'s Reply to Pl.'s Statement of Material
Facts ¶ 33.

## B.  Procedural Background

Plaintiff filed this lawsuit on July 19, 2019, claiming employment discrimination,
retaliation, and a hostile work environment in violation of Title VII.  Compl., ECF No. 1.  On
February 4, 2020, the USDA moved for judgment on the pleadings, arguing that Plaintiff's
claims are not justiciable under *Dep't of Navy v. Egan*, 484 U.S. 518 (1988), because the Court
may not review the agency's decision to deny him a security clearance.  *See generally* Mot. J.
Pleadings, ECF No. 13.  The Court denied that motion on June 24, 2020, concluding that it could
not determine at that early stage of litigation whether Plaintiff's claims required evaluating the
merits of a security clearance investigation.  Mem. Op. Denying J. Pleadings ("Mem. Op.") at 1,
ECF No. 22.  "[M]any issues raised by Plaintiff appear to have little to do with the substance of
the security clearance decision," the Court observed.  *Id.* at 8.  The Court added, however, that

> if after discovery Plaintiff fails to establish a case beyond challenging the security
> clearance decision, or fails to show that any employees made knowingly false
> referrals to the Security Division about him, or that similarly situated employees
> not of his protected class who also lost security clearances were treated more

favorably than he was, the Court will not hesitate to enter judgment for Defendant pursuant to *Egan*.

*Id.* at 10.

Following a lengthy discovery process, during which the Court granted in part and denied in part Plaintiff's motion for discovery sanctions against the USDA, *see* Order, ECF No. 58, the agency now moves for summary judgment, *see* Def.'s Mot., ECF No. 62.  Plaintiff filed his opposition, *see* Pl.'s Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n"), ECF No. 64, and Defendant filed a reply, *see* Def.'s Reply Supp. Mot. Summ. J. ("Def.'s Reply"), ECF No. 69-1.  The motion is now ripe for review.

### III.  LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine if "the evidence presents a sufficient disagreement to require submission to a jury."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).  And a fact is material if it "might affect the outcome of the suit under the governing law."  *Id.* at 248.  On summary judgment, the Court views all evidence "in the light most favorable to the nonmoving party and the [C]ourt [ ] draw[s] all reasonable inferences in favor of the nonmoving party."  *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).  The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact.  *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323.  In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for

trial. *See Celotex*, 477 U.S. at 324. In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## IV.  ANALYSIS

The Court analyzes each of Plaintiff's claims in turn, first addressing his contention that USDA officials discriminated against him based on his race or sexual orientation. The Court then addresses Plaintiff's retaliation and hostile work environment claims. After careful review of the parties' filings and the record, the Court concludes that Plaintiff lacks evidence that would allow a reasonable jury to find in his favor on any of these three claims.[1]

### A.  Employment Discrimination

Plaintiff claims that the USDA violated Title VII because he "was not treated as favorably as similarly situated employees outside of his protected classes (African American, male and heterosexual) . . . in the terms and conditions of his employment as well as in terms of disciplinary, proposed disciplinary and security related administrative actions taken against him." Compl. ¶ 35. The facts alleged in the Complaint indicate that white managers were allowed greater access to "their budgets and spending trends," Compl. ¶ 17, greater flexibility in hiring, *id.* ¶¶ 20, 23, and penalties short of suspension following investigations, *id.* at ¶ 33. On summary judgment, the scope of these issues has narrowed to whether the USDA treated Plaintiff

---

[1] The parties continue to debate the application of *Egan* to the instant case. *See* Def.'s Mot. at 13–20; Pl.'s Opp'n at 16–19. The Court refers the parties to its prior ruling on this issue. *See* Mem. Op. Denying J. Pleadings.

differently from white, gay employees when it initiated an investigation, suspended him, and finally removed him from his position.  *See* Pl.'s Opp'n at 20–21.  The USDA argues that Plaintiff cannot show disparate treatment by comparing his experience to those of other employees, including Quick.  Def.'s Mot. at 21–29.  The USDA adds that it removed Plaintiff from his position because he "could not maintain the required security clearance due to his own misconduct" and "presented a serious security risk for the Agency."  *Id.* at 29.  Plaintiff responds that Quick serves as a comparator from which discriminatory treatment could be inferred.  Pl.'s Opp'n at 20–21.

Title VII of the Civil Rights Act makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).  A plaintiff states a prima facie case of employment discrimination by establishing that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination."  *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002) (quoting *Brown v. Brody*, 199 F.3d 466, 452 (D.C. Cir. 1999)).

Once a plaintiff establishes a prima facie case, the employer must provide a legitimate non-discriminatory or non-retaliatory reason for its adverse action.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015).  If the employer cannot provide an actual, legitimate reason for the action, then the plaintiff is entitled to judgment.  *Allen*, 795 F.3d at 39.  If "the employer proffers a non-retaliatory [or nondiscriminatory] reason for the challenged employment action, the burden-shifting framework falls away."  *Id.*  "[T]he central question" then "becomes whether the employee produced

sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory or non-retaliatory reason was not the actual reason and that the employer intentionally discriminated or retaliated against the employee." *Id.* (cleaned up).

Summary judgment must be granted for the defendant if the plaintiff fails to "produce sufficient evidence that would discredit [the employer's proffered explanation] and show that the actions were retaliatory" or discriminatory. *Baloch v. Kempthorne*, 550 F.3d 1191, 1200 (D.C. Cir. 2008). The Court should consider "all of the evidence," including "any combination of (1) evidence establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer." *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006).

An employee may establish disparate treatment under Title VII by demonstrating that the employer "has 'treated [a] particular person less favorably than others because of' a protected trait." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 985–986 (1988)). As such, "[o]ne way to discredit an employer's justification" for its employment action "is to show that similarly situated employees of a different race received more favorable treatment." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115 (D.C. Cir. 2016). "Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's jobs and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015). In addition, "[a] disparate-treatment plaintiff must establish 'that the defendant had a

discriminatory intent or motive' for taking a job-related action." *Ricci*, 557 U.S. at 577 (quoting *Watson*, 487 U.S. at 986). "'Proof of illicit motive is essential,' and the employee 'at all times' has the burden of proving 'that the defendant intentionally discriminated against' her." *Figueroa v. Pompeo*, 923 F.3d 1078, 1086 (D.C. Cir. 2019) (quoting *Segar v. Smith*, 738 F.2d 1249, 1265, 1267 (D.C. Cir. 1984)).

### 1. Adverse Employment Actions

The Court must first determine which adverse employment actions may be actionable under Title VII. The Court construes Plaintiff's filings as contending that he experienced discrimination (1) when the agency decided to initiate an investigation into his activities; (2) when the agency suspended him with pay; and (3) when the agency eventually removed him from his position. *See* Pl.'s Opp'n at 20–21. In *Chambers v. Dist. of Columbia*, 35 F.4th 870 (D.C. Cir. 2022) (en banc), the D.C. Circuit adopted a capacious view of which employment actions can give rise to a Title VII discrimination claim. There, the court held that the statute means what it says, and that it reaches any change that "affects an employee's 'terms, conditions, or privileges of employment.'" *Id.* at 874. Plaintiff's termination presents the easy question, as it plainly represents an adverse employment action. *See Douglas v. Donovan*, 559 F.3d 549, 552–54 (D.C. Cir. 2009). In contrast, the agency's decisions to initiate an investigation and suspend Plaintiff without pay represent closer calls.

Courts in this district have habitually held that "the mere initiation of" an investigation does not "have a sufficiently adverse effect on [a] plaintiff's employment to be actionable." *Ware v. Billington*, 344 F. Supp. 2d 63, 76 (D.D.C. 2004); *see also Moore v. United States Dep't of State*, 351 F. Supp. 3d 76, 95 (D.D.C. 2019) ("request for an investigation by an independent body (as opposed to the disciplinary action that may follow) does not constitute an actionable

adverse employment action").  Courts previously observed a limited exception for situations where the initiation of an investigation carries other consequences, such as denial of a promotion, which combined arises to adverse employment action.  *See, e.g.*, *King v. Holder*, 77 F. Supp. 3d 146, 151 (D.D.C. 2015).  The more inclusive standard articulated in *Chambers* may affect these conclusions, however.  An investigation into an employee's conduct may well be carried out with discriminatory animus and itself impact the "terms, conditions, or privileges of employment."  42 U.S.C. § 2000e–2(a)(1).  The D.C. Circuit explained in *Chambers* that "public humiliation or loss of reputation," which misconduct investigations often beget, represent "more than de minimis harms" to an employee.  35 F.4th at 875.  And earlier this year the Supreme Court reasserted that "[t]he 'terms [or] conditions' phrase . . . is not used 'in the narrow contractual sense'; it covers more than the 'economic or tangible.'"  *Muldrow v. City of St. Louis, Missouri*, 144 S. Ct. 967, 974 (2024) (quoting *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 78 (1998)).  The Supreme Court additionally disavowed the idea that a Title VII plaintiff must "show that the injury satisfies a significance test," *id.* at 972, and that he instead must simply show that he was "treat[ed] worse" for a prohibited reason, *id.* at 974.  In light of these opinions clarifying the scope of Title VII, the Court is not convinced that the discriminatory initiation of a misconduct investigation lies outside the statute's reach, in particular in a situation where the result of the investigation is that Plaintiff is separated from his work responsibilities and professional networks for an extended period of time, as discussed below.  The Court does not resolve this issue, however, because the parties did not brief it and, as explained below, Plaintiff ultimately provides insufficient evidence to show that the investigation was carried out with discriminatory intent.

Whether Plaintiff was subjected to an adverse employment action when the USDA suspended him with pay is similarly unclear.  Courts in this district have generally held that "suspension with pay" does not "constitute an adverse employment action."  *Brown v. Georgetown Univ. Hosp. Medstar Health*, 828 F. Supp. 2d 1, 9 (D.D.C. 2011); *see also Jones v. Castro*, 168 F. Supp. 3d 169, 179 (D.D.C. 2016) ("[A] 19 month period of paid administrative leave while an investigation is ongoing . . . does not, by itself, constitute an adverse action.").  *Chambers* and *Muldrow* may again impact these holdings.  Whether an individual is in fact allowed to work in his role could be viewed as affecting the "terms, conditions, or privileges of employment."  42 U.S.C. § 2000e–2(a)(1).  At least one court in this district has nonetheless held, post-*Chambers*, that paid administrative leave does not constitute an adverse employment action.  *See Hockaday v. Washington Metro. Area Transit Auth.*, No. 21-cv-03265, 2023 WL 3844388, at *8 (D.D.C. June 6, 2023).  The issue remains an open question in this circuit.  *See Cooper v. Am. Univ.*, No. 22-7067, 2023 WL 179304, at *2 n.4 (D.C. Cir. Jan. 13, 2023) ("We do not reach the question of whether paid administrative leave is an adverse action."); *Hornsby v. Watt*, No. 17-5001, 2017 WL 11687516, at *1 (D.C. Cir. Nov. 14, 2017) ("leaving open" the question of whether "being placed on administrative leave could constitute the type of adverse action that would support a retaliation claim").  Similarly to the Court's treatment of the investigation, the Court need not resolve the suspension issue here because, as explained below, Plaintiff produces no evidence showing that the USDA placed him on paid administrative leave for discriminatory reasons.  The Court next turns to each adverse employment action to determine if there is any genuine issue of material fact precluding summary judgment.

## 2.  USDA's Investigation

To the extent that Plaintiff argues he experienced discrimination because the USDA initiated an investigation into his conduct, *see* Compl. ¶¶ 35–36; Pl.'s Opp'n. at 20, that basis for his Title VII claim lacks sufficient evidence to create a question of fact for a jury.  Plaintiff asserts that "[t]he focus" of his "race and sexual orientation discrimination claim is Bryce Quick."  Pl.'s Opp'n at 16.  Plaintiff thus presents Quick as a comparator of a "different race" and sexual orientation who "received more favorable treatment."  *Wheeler*, 812 F.3d at 1115; *see also Burley*, 801 F.3d at 301 ("A plaintiff can establish pretext masking a discriminatory motive by presenting 'evidence suggesting that the employer treated other employees of a different race . . . more favorably in the same factual circumstances.'").  It is plain, however, that Quick did not receive more favorable treatment regarding the agency's decisions to investigate the two employees.  The USDA received misconduct complaints against Plaintiff in November and December 2016, and it soon opened an investigation.  Def.'s Statement ¶¶ 9–11.  When Plaintiff made complaints against Quick in late 2016, the agency opened an investigation of his activities, as well.  Def.'s Reply to Pl.'s Statement of Material Facts ¶¶ 8, 38; Def.'s Statement ¶¶ 47–48.  Plaintiff additionally asserts, when questioning the USDA's reasoning for immediately suspending him, that "Quick was subjected to a more serious criminal misconduct investigation while Young was subjected to an employee misconduct investigation."  Pl.'s Opp'n at 20.  In light of these facts, the Court concludes that there is no genuine dispute of material fact over whether Quick received "more favorable treatment" in the context of the individuals' respective misconduct investigations.  *Wheeler*, 812 F.3d at 1115.  As a result, the Court need not decide whether the USDA's misconduct investigation into Plaintiff's activities constituted adverse employment action.

### 3.  Plaintiff's Suspension

Plaintiff argues that he experienced discrimination because he was suspended immediately after the USDA withdrew his interim clearance, while Quick was not.  *See* Pl.'s Opp'n at 20–21.  Again, Plaintiff presents Quick as a comparator of a "different race" and sexual orientation who "received more favorable treatment."  *Wheeler*, 812 F.3d at 1115.  To present Quick as a comparator, Plaintiff must "demonstrate that 'all of the relevant aspects of [his] employment situation were nearly identical to" Quick's.  *Burley*, 801 F.3d at 301 (quoting *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999)).  When determining whether a plaintiff and another employee were similarly situated, courts typically look to "the similarity of the plaintiff's and the putative comparator's jobs and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses."  *Id.*  "While no 'numerosity' requirement applies to comparators, such that a 'single comparator' may suffice to support an inference of discrimination, 'the degree of similarity necessary may vary in accordance with the size of the potential comparator pool, as well as to the extent to which the plaintiff cherry-picks would-be comparators.'"  *Burton v. District of Columbia*, 153 F. Supp. 3d 13, 67 (D.D.C. 2015) (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405, 406–07 (7th Cir. 2007)).

Quick cannot serve as the sole comparator to Plaintiff because their "employment situation[s]" were not "nearly identical" in "all of the relevant aspects."  *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995).  First, Plaintiff has to some degree "cherry-pick[ed]" Quick from the pool of potential comparators.  *Burton*, 153 F. Supp. 3d at 67.  The USDA turned over records relating to other employees whose clearances were suspended or withdrawn, many of whom were placed on administrative leave as a result.  *See* Ex.

U to Def.'s Mot. at 2–5.  At least one of those individuals was a Caucasian employee placed on administrative leave due to suspension of her clearance.  *Id.* at 5; Ex. Z to Def.'s Reply at 5, ECF No. 69-5.  The agency includes these individuals in its motion for summary judgment, *see* Def.'s Mot. at 24–28, but Plaintiff narrows the field of comparators to Quick alone without addressing these other examples, *see* Pl.'s Opp'n at 16.

Second, Plaintiff's "job duties" differed significantly from Quick's.  Courts often look to the duties attending each employee's position when evaluating whether they are appropriate comparators.  *See Barbour v. Browner*, 181 F.3d 1342, 1345 (D.C. Cir. 1999) (concluding that a GS-12 employee was not similarly situated to another GS-13 employee because the GS-13 performed several duties that the GS-12 did not); *Banks v. Perdue*, 298 F. Supp. 3d 94, 104 (D.D.C. 2018) (concluding that a jury could find two employees similarly situated in part because they were both "deputy directors in USDA's Office of Civil Rights" and were both "members of the SES").  As Chief Information Officer, Plaintiff "direct[ed] the Information Technology program area in the [FAS] and [was] responsible for management and oversight of information technology support."  Ex. A to Def.'s Mot. at 80.  The role was classified as GS-15. *Id.*  In addition to planning and budgeting, Plaintiff's duties included "security implementation," "evaluation of security of program data," and "assess[ment of] security events."  *Id.* at 81.  The role also involved travel to overseas posts to provide "IT support" and to "assess the IT needs and operations at posts and/or to provide training."  Richard Young Decl., Ex. 1 to Pl.'s Opp'n at ¶ 60, ECF No. 64-2.  In contrast, as Chief Operating Officer, Quick headed the office that was "responsible for worldwide management of several agency-level functions."  Ex. N to Def.'s Mot. at 12.  This included "conduct[ing] liaison with principal staff within the USDA and its agencies, and other Federal entities."  *Id.*  Quick's position was also part of the Senior Executive

14

Service.  Def.'s Statement ¶ 6.  It stands to reason that the employees' different positions, duties, and accompanying skillsets would affect their respective requirements to maintain security clearance eligibility, as well as the agency's ability to deploy them in other roles.

Third, Plaintiff and Quick reported to different supervisors.  Plaintiff reported to Associate Chief Operating Officer Ronald Croushorn, who made the decision to place him on administrative leave.  Ex. F to Def.'s Mot, ECF No. 62-8.  The Associate Chief Operating Officer reported to Quick, who in turn reported to FAS Administrator Isley.  Ex. C to Def.'s Mot. at 3, 5.  The Administrator made the decision to suspend Quick.  *Id.* at 3.  Plaintiff and Quick were not "disciplined by the same supervisor" after the agency withdrew or suspended their clearances, *Burley*, 801 F.3d at 301, further weakening the probative value of Quick as a comparator.  *Compare Banks*, 298 F. Supp. 3d at 104 (concluding that two USDA employees were similarly situated in part because they had the same supervisor) *with White v. Tapella*, 876 F. Supp. 2d 58, 70 (D.D.C. 2012) (discounting comparator police officers assigned to a different supervisors) *and Huckstep v. Washington Metro. Area Transit Auth.*, 216 F. Supp. 3d 69, 80 (D.D.C. 2016) (concluding bus drivers assigned to different supervisors were not proper comparators).

Fourth, just as their duties differed, the employees' varying positions in the agency's hierarchy—Quick two levels higher than Plaintiff and reporting to the head of the FAS—could be expected to affect the agency's willingness to maintain Quick for a period of time after suspension of his clearance.  The D.C. Circuit addressed a similar issue in *Neuren*, concluding that the difference in seniority between the plaintiff legal associate and another associate undermined her claim that they were similarly situated.  43 F.3d at 1514.  The same problem applies here when comparing Plaintiff to Quick.  Indeed, Quick had served as Chief Operating

Officer since March 2011, Ex. N to Def.'s Mot. at 12, meaning that he had worked at the agency for at least eight years prior to suspension of his clearance.  In contrast, Plaintiff had been in his role for two years and lacked a fully adjudicated clearance.  This observation further differentiates Plaintiff from Quick.

Fifth, the USDA argues that Quick and other potential comparators are inapposite because they had "final security clearances" while "Plaintiff had only been granted a temporary or interim clearance, which is given at the discretion of the agency while the investigation and final adjudication process continues."  Def.'s Reply at 9.  Plaintiff can be compared to a probationary employee that cannot be properly equated to a permanent employee.  *See McKenna v. Weinberger*, 729 F.2d 783, 789 (D.C. Cir. 1984) (concluding that two "permanent employees" were "not similarly situated" to a plaintiff probationary employee); *Holbrook*, 196 F.3d at 262 (concluding that a "probationary" employee was not "similarly situated to a fifteen-year veteran with supervisory responsibilities").  This adds further daylight between the two individuals.

The only factor that might support Quick's value as a comparator for Plaintiff's suspension is the "similarity of their offenses."  *Burley*, 801 F.3d at 301.  The agency insists that it suspended and later removed Plaintiff because "[h]e could not maintain the required security clearance due to his own misconduct."  Def.'s Mot. at 29.  Although the agency had discovered evidence Plaintiff improperly shared his credentials, misused contractor resources, and participated in unauthorized speaking events at the time Associate Chief Operating Officer Croushorn decided to suspend him, *see* Ex. J to Def.'s Mot. at 9–12, Croushorn stated in an email to Plaintiff that he was "not privy to the factors that led to the decision by the Department to withdraw [Plaintiff's] interim secret security clearance," Ex. 10 to Pl.'s Opp'n at 11, ECF No. 64-11.  The decisionmaker was thus aware only of the security clearance withdrawal as a basis

for suspension.  At the time of Quick's suspension in October 2019, the agency had similarly yet to complete its investigation, and it is unclear whether Administrator Isley was aware of any substantiated misconduct at that time.  *See generally* Ex. L. to Def.'s Mot.  The employees' "offenses" are thus similar in the sense that both were suspended for failure to maintain a security clearance during ongoing investigations.  This is not enough, however, to advance Quick as a comparator where other dramatic differences existed between the two.

In light of these considerations, the Court concludes that no reasonable juror would conclude that Quick serves as a proper comparator to Plaintiff, or that any difference in their treatment demonstrates discriminatory animus.  This case can be readily compared to *Banks v. Perdue*, a Title VII case in which the plaintiff alleged discriminatory removal from her position at the USDA.  298 F. Supp. 3d at 98.  The court there determined that two employees "were similarly situated" because "(i) both [p]laintiff and [the comparator] were members of the SES . . . ; (ii) both were deputy directors in USDA's Office of Civil Rights; (iii) both shared the same supervisor . . . ; and (iv) both received an unsatisfactory rating for poor work performance . . . and were recommended for removal from the SES at the same time."  *Id.* at 104.  Here, in contrast, the employees' duties differed significantly, they reported to different supervisors of different ranks, they occupied different positions in the organization's hierarchy, they served at the agency for different periods of time, and one had a fully adjudicated clearance while the other had an interim clearance.  These differences between the two employees' situations represent "confounding variables" that prevent "isolat[ion of] the critical independent variable: complaints about discrimination."  *Burton*, 153 F. Supp. 3d at 67 (quoting *Hnin v. TOA (USA), LLC*, 751 F.3d 499, 504–505 (7th Cir. 2014)).  It is true that although the FAS suspended Plaintiff immediately after withdrawal of his interim clearance, it allowed Quick to continue

working for approximately six months.  But it is impossible to untangle that six-month delay from these differences between the employees.

Plaintiff presents no other evidence demonstrating that the FAS or the USDA "intentionally discriminated against" him when it suspended him due to lack of a security clearance.  *Figueroa*, 923 F.3d at 1086.  Assuming that placement on paid administrative leave is an adverse employment action, Plaintiff has presented no evidence that would allow a jury to conclude that the USDA did so because of his membership in a protected class.[2]

#### 4.  Plaintiff's Removal

Plaintiff argues that he experienced discrimination in connection with his removal because "[t]he Administrator decided that Quick would not be removed but that [Plaintiff] would be."  Pl.'s Opp'n at 21.  Plaintiff produces no evidence showing that his removal was based on discriminatory intent.  First, as previously discussed, Quick is not a proper comparator to Plaintiff, and any differences in the two employees' treatment may well be explained by the many other confounding variables.  In addition, by the time of their respective removals, the agency had completed its investigations.  The agency believed Plaintiff had shared his login credentials with contractors, used contractor time for personal tasks, and participated in unauthorized speaking engagements.  *See* Ex. E to Def.'s Mot.  In comparison, the agency determined that Quick had made a false statement during an earlier 2017 investigation but determined that the rest of the allegations Plaintiff made against him were unsubstantiated.  *See*

---

[2] The Court notes that Plaintiff appears to have served in his role from January 2015 to February 2016 without a security clearance, which may raise the question as to whether Plaintiff did in fact require the clearance to perform his duties, and whether suspension was necessary when the agency withdrew his interim clearance.  The parties do not address this issue, and Plaintiff chooses to rely wholly on comparator evidence to support his claim.  *See* Pl.'s Opp'n at 20–21.  The Court declines to grapple with a factual dispute the parties themselves have not found relevant.

Ex. N to Def.'s Mot. 2–3.  By the time of their respective removals, the offenses of which the agency was aware were entirely dissimilar, further undermining Quick's value as a comparator to Plaintiff.

Second, Plaintiff does not show that he and Quick did receive differential treatment with respect to removal.  When the agency determined it could not place Plaintiff in a position that did not require a clearance, it removed him after placing him on paid administrative leave for nearly two years.  *See* Ex. K to Def.'s Mot. at 2; Def.'s Statement ¶¶ 39–40.  Administrator Isley explained that he could not find an alternative position for Plaintiff because "particularly [for] someone of Mr. Young's level and training, there would have not been . . . a position" for him without a security clearance.  Ex. L to Def.'s Mot. at 5.  When the agency concluded that it lacked an uncleared position for Quick, it suspended him without pay, as well.  Def.'s Statement ¶¶ 58, 61.  Quick resigned from his position six weeks later rather than wait for the agency to remove him.  *Id.* ¶ 59.  Plaintiff therefore cannot show that he experienced discriminatory removal by comparing himself to Quick.

Finally, the agency presents evidence of the broader pool of employees whose clearances were suspended in the timeframe Plaintiff requested during discovery.  It reveals no indication of broader racial discrimination, and Plaintiff presents no rebuttal nor relies on any of these individuals as a comparator.[3]  The USDA removed four out of the eleven employees whose clearances were indefinitely suspended.  *See* Def.'s Mot. at 24–27 (collecting supporting exhibits).  Two of the removed individuals were Caucasian, and two were African American

---

[3] Plaintiff instead contends that "there is also evidence that other white employees were similarly the subject of employee misconduct investigations without action on their clearances." Pl.'s Opp'n at 21.  This argument attacks the decision to withdraw Plaintiff's interim clearance and not the decision to suspend him following that withdrawal.  As such, the argument runs headlong into *Egan*.

(including Plaintiff).  *Id.*  Five other individuals—two Caucasian employees (including Quick),

two Hispanic employees, and one African American employee—retired or resigned before the

agency removed them.  *Id.*  Only two individuals—one Hispanic employee and one Caucasian

employee—remained at the agency.  *Id.*  One of those individuals, for instance, was an

Employee and Labor Relations Specialist whose position did not require a clearance.  *Id.* at 25.

This evidence reveals no pattern in which employees with suspended clearances were retained or

removed based on membership in a protected class.

Other than pointing to Quick and these other employees, Plaintiff identifies no additional

evidence supporting his claim that the USDA removed him because of his membership in a

protected class.  *See* Pl.'s Opp'n at 20–21.  As there is no genuine dispute of material fact for a

jury to resolve, Defendant is entitled to summary judgment on Plaintiff's employment

discrimination claim.

### B.  Retaliation

Plaintiff claims that he was placed on administrative leave "within a week or so of

seeking counseling" through the agency's Equal Employment Opportunity ("EEO") process.

Compl. ¶ 24.  Plaintiff thus contends that the investigation and his placement on administrative

leave were unlawful "retaliatory conduct."  *Id.* ¶ 39.  The USDA argues that the evidence

demonstrates that the agency suspended and then removed Plaintiff due to withdrawal of his

interim clearance, not as retaliation for his engagement in protected activity.  Def.'s Mot. at 29–

30.  Plaintiff responds that he has established a prima facie case that the agency retaliated against

him for filing an Equal Employment Opportunity complaint.  Pl.'s Opp'n at 22; Ex. 5 to Pl.'s

Opp'n, ECF No. 64-6 (Richard Young EEO Counselor report).  The Court agrees with the

agency.

To succeed on a retaliation claim, a plaintiff needs to show "that she engaged in protected activity, that she suffered an adverse employment action, and that there was a causal link between the former and the latter." *Allen*, 795 F.3d at 39. Plaintiff contends that the "[c]lose temporal proximity between an EEO complaint and a personnel action is sufficient to establish a prima facie case." Pl.'s Opp'n at 22. Yet while temporal proximity may suffice to establish a prima facie case of discrimination within the *McDonnell Douglas* burden-shifting framework, *see Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001), once an employer provides legitimate, non-retaliatory reasons for its action, "positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine." *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007). Because the USDA has proffered a non-retaliatory reason for its employment actions, "the burden-shifting framework falls away." *Allen*, 795 F.3d at 39. The question is now whether there is "sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory or non-retaliatory reason was not the actual reason and that the employer intentionally discriminated or retaliated against the employee." *Id.* (cleaned up).

The parties do not dispute that Plaintiff sought EEO counseling on February 24, 2017, approximately one week before the USDA suspended him on March 2, 2017. Def.'s Reply to Pl.'s Statement of Material Facts ¶¶ 11–13; Ex. 5 to Pl.'s Opp'n. Plaintiff additionally asserts that the Agency did not begin its investigation into his activities until March 9, 2017, after he approached the EEO. Def.'s Reply to Pl.'s Statement of Material Facts ¶ 13. As evidence of this, Plaintiff points to the agency's June 25, 2017, investigative report showing that witness interviews began on March 9, 2017. Ex. 7 to Pl.'s Opp'n at 5, ECF No. 64-8. That argument makes little sense given that the agency had already uncovered what it believed to be unreported,

negative information regarding Plaintiff's outstanding civil judgment at the time it withdrew his interim security clearance on March 2, 2017, meaning that the agency necessarily would have started investigating on or before that date. *See* Ex. E to Def.'s Mot.  In addition, misconduct investigations involve more than just witness interviews, and the full investigative report shows that the agency's Personnel Misconduct Investigator began reviewing Plaintiff's emails on November 23, 2016.  Ex. J. to Def.'s Mot. at 9.  The Director of FAS's Compliance, Security and Emergency Planning Division explained in deposition testimony that "investigative activity began in November of 2016," but that her office "did not notify the Department until March 2nd, once [it] had sufficient information that substantiated some of the allegations in that investigation."  Ex. H to Pl.'s Mot. at 8, ECF No. 62-10.  Plaintiff's contention that the investigation began after he sought EEO counseling is plainly refuted by the record.

The record similarly contains no evidence of a causal connection between Plaintiff's EEO complaint and his suspension.  Internal USDA communications show that the Director of FAS's Compliance, Security and Emergency Planning Division reported on March 2, 2017, that it had found a civil judgment of which it was previously "not aware."  Ex. E to Def.'s Mot at 2.  In a letter the following day, Plaintiff's supervisor explained that "I received notice that your interim Secret Security clearance was suspended on March 2, 2017.  This letter notifies you that I am placing you on administrative leave, until further notice."  Ex. F to Def.'s Mot. at 2.  Plaintiff himself provides agency email records between security personnel and Plaintiff's supervisor showing that he suspended Plaintiff as a direct result of the security clearance withdrawal.  *See* Ex. 10 to Pl.'s Opp'n.  Security staff informed Plaintiff's supervisor that "[p]rocedurally, since we were given notification of the withdrawal of the Interim Secret security clearance and that was provided to you via the email I forwarded on March 2, 2017, you took appropriate,

immediate action" by suspending Plaintiff. *Id.* at 9.  This documentation presents strong evidence that the agency placed Plaintiff on administrative leave as a direct result of withdrawal of his clearance and for no other reason.

Plaintiff presents no evidence tending to show that the agency suspended him in retaliation for his EEO complaint rather than withdrawal of his clearance.  He cannot point to "'changes and inconsistencies' in the [USDA's] given reasons for the decision," evidence that the USDA "failed to 'follow established procedures or criteria'" when it investigated and suspended him;[4] or documentation that the USDA's "'general treatment of' . . . employees who asserted their Title VII rights . . . was worse than its treatment of . . . employees who did not assert their Title VII rights."  *Allen*, 795 F.3d at 40 (quoting *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 495 n.3 (D.C. Cir. 2008)).  Nor does he provide anything indicating that the USDA's "proffered reasons are 'unworthy of credence.'"  *Id.* (quoting *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009)).

Plaintiff points the Court to nothing outside the temporal proximity between his EEO counseling and his suspension.  *See* Pl.'s Opp'n at 22.  On its own view of the record, the Court finds no other evidence tending to show that the individuals who decided to suspend Plaintiff knew about his Equal Employment Opportunity complaint or took adverse employment action against him because of the complaint.  "[J]udgment in an employer's favor is appropriate where the plaintiff's evidence calling the employer's proffered reason into doubt is weak, and the record also contains 'abundant and uncontroverted independent evidence that no discrimination [or retaliation] had occurred.'"  *Allen*, 795 F.3d at 40 (quoting *Reeves v. Sanderson Plumbing*

---

[4] Plaintiff does challenge the procedures the Agency used for "revocation or suspension of a security clearance."  Def.'s Reply to Pl.'s Statement of Material Facts ¶ 15.  This issue is not actionable under Title VII in light of *Egan*.

*Prods., Inc.*, 530 U.S. 133, 148 (2000)).  As a result, the agency is entitled to summary judgment on Plaintiff's retaliation claim.

## C.  Hostile Work Environment

Finally, Plaintiff claims that USDA officials "subjected Plaintiff to harassment because of his race, gender and sexual orientation and retaliatory harassment because of Plaintiff's complaints."  Compl. ¶ 41.  He asserts that "[t]he harassment was severe and/or pervasive and negatively impacted Plaintiff's ability to perform his position."  *Id.*  The USDA contends the evidence shows that Plaintiff was "not subject to a hostile work environment permeated with discriminatory intimidation, ridicule, and insult" as required for relief under Title VII.  Def.'s Mot. at 31.  Plaintiff asserts that an official threatened him and that Quick instructed a contractor to hire a private investigator to follow him.  Pl.'s Opp'n at 22–23.  The USDA's position prevails.

To succeed on a hostile work environment claim, "a plaintiff must show that his employer subjected him to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Baloch*, 550 F.3d at 1201 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  The standard "presents a high bar," as "Title VII is not meant to be a general civility code."  *Foxworth v. McDonough*, No. 23-cv-2195, 2024 WL 111761, at *6 (D.D.C. Jan. 10, 2024).  In evaluating a hostile-environment claim, a court "looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance."  *Baloch*, 550 F.3d at 1201 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)).  "[T]o demonstrate a hostile work environment in violation of Title VII, a plaintiff 'must always prove

that the conduct at issue was not merely tinged with offensive . . . connotations, but actually constituted discrimination . . . *because of* the employee's race" or sex. *Burton*, 153 F. Supp. 3d at 85 (quoting *Oncale*, 523 U.S. at 81); *Bryant v. Brownlee*, 265 F. Supp. 2d 52, 64 (D.D.C. 2003) (granting motion to dismiss hostile work environment complaint where alleged events lacked "racial or age-related overtones"); *Harris v. Wackenhut Servs., Inc.*, 419 F. App'x 1, 2 (D.C. Cir. 2011) (citing *Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1123 (D.C. Cir. 2002) (concluding that evidence that "bears no connection to [the plaintiff's] race … cannot support a hostile work environment claim").

None of the events Plaintiff cites had any discernable connection to his membership in a protected class, such that no reasonable jury could find he was subjected to a hostile work environment based on his race or sexual orientation.  Plaintiff cites his declaration stating that an agency undersecretary rebuffed complaints about Quick's hiring practices by asserting that the undersecretary "takes care of his friends."  Ex. 1 to Pl.'s Opp'n ¶ 49; *see also* Pl.'s Opp'n at 23. Plaintiff does not explain how this exchange relates to his race or sexual orientation, and the inference is not apparent to the Court.  Plaintiff also asserts that another official hired a private investigator to follow him but provides no details about when and for how long this occurred. Ex. 1 to Pl.'s Opp'n ¶ 58; *see also* Pl.'s Opp'n at 23.  It is again unclear how this event reflects animus based on Plaintiff's membership in a protected class.  Finally, Plaintiff states in his opposition that a contractor "falsely accused him of hiring contractors who were friends (damaging his reputation) and oddly claimed he had done something wrong by driving a luxury vehicle."  Pl.'s Opp'n at 23 (citing Ex. 1 to Pl.'s Opp'n ¶ 58).[5]  These events are not supported

---

[5] Plaintiff's reference to his vehicle may relate to an allegation that Plaintiff improperly used a Mercedes-Benz leased by a contractor.  *See* Ex. J to Def.'s Mot. at 4.

by any admissible evidence in the record, and they once again do not demonstrate animus
"because of [Plaintiff's] race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–
2(a)(1).

The only reference Plaintiff makes to harassment based on discriminatory animus appears
in his statement of material facts, citing "microaggressions and other conduct he believed to be
on the basis of his race and sexual orientation."  *See* Def.'s Reply to Pl.'s Statement of Material
Facts ¶ 11.  That paragraph cites a form related to Plaintiff's Equal Employment Opportunity
complaint, which contains no relevant details and appears to be missing forty-nine of the fifty-
one pages in the document.  *See id.* (citing Ex. 5 to Pl.'s Opp'n).  These conclusory allegations
unsupported by specific facts in the record are insufficient to survive summary judgment and
create a triable issue of fact for a jury.  *See Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S.
Dep't of Transp.*, 564 F.3d 462, 466 (D.C. Cir. 2009); *Greene*, 164 F.3d at 675.

While Plaintiff's facts may support some form of whistleblower retaliation claim, they do
not evince a discriminatory work environment.  *See Stella*, 284 F.3d at 142 (observing that
"whistleblowing activity" includes "disclosing illegal conduct, gross mismanagement, gross
wasting of funds, or actions presenting substantial dangers to health and safety"); *Mintzmyer v.
Dep't of Interior*, 84 F.3d 419, 423 (Fed. Cir. 1996) ("[A] discrimination claim is distinct from a
whistleblowing claim.").  Nor are they sufficiently "extreme to amount to a change in the terms
and conditions of employment."  *Faragher*, 524 U.S. at 788.  Because Plaintiff fails to establish
a genuine dispute of material fact in relation to his hostile work environment claim, the USDA is
entitled to summary judgment on that issue, as well.

## V.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED**.

An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  August 26, 2024                                    RUDOLPH CONTRERAS
                                                           United States District Judge